# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HARLAN TEN PAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 18 C 3694 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| THE LINCOLN NATIONAL LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

On August 31, 2014, Harlan Ten Pas, a former tax attorney with McGladrey LLP ("McGladrey"), suffered a heart attack that required hospitalization and stents in his artery. Within a week, he suffered two strokes and had to take a medical leave of absence from work. Ten Pas now brings this action against Lincoln National Insurance Company ("Lincoln"), the administrator of McGladrey's long-term disability plan for employees, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Ten Pas seeks a declaratory judgment that Lincoln erred by setting his "first day of Disability," Doc. 48 ¶ 11, on August 31, 2014, thereby reducing his monthly disability payments by several thousand dollars because of a raise he received on September 1, 2014. The parties now bring cross-motions for summary judgment. The Court finds that setting Ten Pas' first day of Disability on August 31, 2014, contravenes the plain language of the ERISA policy and that Lincoln unreasonably calculated his benefits according to his pre-September 1 salary. Consequently, the Court grants summary judgment to Ten Pas.

## BACKGROUND

### I. Ten Pas' Heart Attack and Strokes

Ten Pas was a lead tax partner at the Chicago office of McGladrey, a tax and consulting firm, now known as RSM US LLP. On Friday, August 29, 2014, Ten Pas worked a full day at the office. He worked part of the day on Saturday, August 30, and Sunday, August 31, before going to his summer cabin in Wisconsin for the Labor Day weekend. While at his cabin, Ten Pas suffered chest pains and went to Oconomowoc Memorial Hospital in Wisconsin. The treating cardiologist admitted Ten Pas to the intensive care unit. On Monday, September 1, which was Labor Day, Ten Pas underwent cardiac angioplasty. The procedure included the placement of a drug-eluting stent to keep an occluded artery open. Physicians discharged Ten Pas the next day, Tuesday, September 2, with several diagnoses, including myocardial infarction, i.e. a heart attack.

On Wednesday, September 3, Ten Pas returned to work at the office. Ten Pas went home in the afternoon after experiencing some numbness, and later that day was admitted to the emergency room at Highland Park Hospital in Highland Park, Illinois. Ten Pas was "found to have subacute infarction," i.e. a stroke. Doc. 48 ¶ 33. Ten Pas remained at the hospital Wednesday night and Thursday, before returning home on Friday, September 5. On Saturday, September 6, Ten Pas went to Highland Park Hospital again, and underwent a CT scan. The treating physician noted that he had suffered an intracranial hemorrhage. Ten Pas remained hospitalized until Highland Park transferred Ten Pas to the Rehabilitation Institute of Chicago on September 12. The Rehabilitation Institute discharged Ten Pas to his home on October 20.

## II. The Long-Term Disability Insurance Policy

Ten Pas was a participant in McGladrey's long-term disability plan for employees, which Lincoln administered according to the terms of McGladrey's Group Long-Term Disability Insurance Policy (the "Policy"). The Policy pays "a Total Disability Monthly Benefit," *id.* ¶ 16, to "Class 1" employees after an "Elimination Period" of 180 days of Disability, *id.* ¶¶ 11, 13. The Elimination Period "begins on the first day of Disability" and employees may return to full-time work during that period so long as they accrue 180 days of Disability, "caused by the same or a related Sickness or Injury," within a one-year period. *Id.* ¶ 11.

Ten Pas was a Class 1 employee, eligible for long-term Disability benefits equal to 60% of his basic monthly earnings. His benefits could "not exceed the amount shown in the Employer's financial records [or] the amount for which premium has been paid[.]" *Id.* ¶ 19. McGladrey paid premiums on a monthly basis as a percentage of their payroll.

The Policy calculates an employee's benefits according to the employee's monthly salary on the "Determination Date." *Id.* ¶ 19. The Determination Date is defined as "the last day worked just prior to the date the Disability begins." *Id*. "Disability" or "Disabled" means "Total Disability or Partial Disability." *Id.* ¶ 7. Total Disability and "Totally Disabled" are defined as: "During the Elimination Period . . . due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation." *Id.* ¶ 7. Partial Disability or "Partially Disabled" are defined as: "During the Elimination Period . . . due to an Injury or Sickness the Insured Employee[] is unable to perform one or more of the Main Duties of his or her Own Occupation; or is unable to perform such duties full-time; and is engaged in Partial Disability Employment." *Id.* ¶ 8. Main Duties are defined as job tasks that: "are normally required to perform an occupation" and "could not reasonably be modified or omitted." *Id.* ¶ 10.

The Policy also contains a provision defining Active Work:

> ACTIVE WORK or ACTIVELY AT WORK means an Employee's full-time performance of all Main Duties of his or her Own Occupation, for the regularly scheduled number of hours, at:
> 1. the Employer's usual place of business; or
> 2. any other business location where the Employer requires the Employee to travel.
>
> Unless disabled on the prior workday or on the day of absence, an Employee will be considered Actively at Work on the following days:
> 1. a Saturday, Sunday or holiday that is not a scheduled workday;
> 2. a paid vacation day or other scheduled or unscheduled non-workday; or
> 3. a non-medical leave of absence of 12 weeks or less, whether taken with the Employer's prior approval or on an emergency basis.

*Id.* ¶ 21. Relevant to this case, the Active Work terminology is incorporated in two sections of the Policy titled "Effective Dates" and "Individual Termination." *Id.* ¶¶ 20, 22; Doc. 48-1 at 115. The Effective Dates section states:

> An Employee's initial amount of coverage becomes effective at 12:01 a.m. on the latest of:
> 1. the first day of the Insurance Month following the date the Employee becomes eligible for the coverage;
> 2. the date the Employee resumes Active Work, if not Actively at Work on the day he or she becomes eligible;
> 3. the date the Employee makes written application for coverage . . .
> 4. the date the Company approves the Employee's Evidence of Insurability, if required.

*Id.* ¶ 20. The Individual Termination section, under a provision titled "Continuation Rights," provides that: "Ceasing Active Work results in termination of the Insured Employee's eligibility for insurance, but . . . [i]f an employee is absent due to Total Disability or is engaged in Partial Disability Employment, coverage may be continued during[] the Elimination Period; provided the Company receives the required premium from the Employer." *Id.* ¶ 22.

4

**III.     Initial Determination of Disability Benefits**

In January 2015, McGladrey and Ten Pas began submitting paperwork to Lincoln for Ten Pas to receive long-term Disability benefits. McGladrey submitted an Employer's Statement that indicated Ten Pas' last full day of work was September 5, 2014, and that his regular scheduled work week was forty hours per week, eight hours per day. Ten Pas submitted an Employee's Statement wherein he also indicated that his last full day of work was September 5. McGladrey and Ten Pas also submitted two Physician Statements from doctors at the Rehabilitation Institute. The first was from Dr. Elliot Roth, who Ten Pas first saw on September 16, 2014. Dr. Roth indicated that Ten Pas' symptoms began to appear on August 31, and that this was the date "recommend(ed) [that] the patient stop work." *Id*. ¶ 40. The second was from Dr. Susan Keeshin, who Ten Pas first visited on October 27, 2014. Dr. Keeshin indicated that Ten Pas' symptoms first appeared, and that he was first unable to work, on September 2.

Ten Pas' last day of work was significant because Ten Pas earned $12,500 bi-weekly until the pay period ending August 31, 2014. On September 1, Ten Pas received a raise that increased his bi-weekly salary to $15,000. Given the discrepancy in the dates from Dr. Roth and Dr. Keeshin on the one hand, and from Ten Pas and McGladrey on the other, Lincoln attempted to confirm Ten Pas' last full day of work. Lincoln contacted McGladrey's benefits specialist and asked for documentation substantiating Ten Pas' work the first week of September. In response, McGladrey indicated that Ten Pas was in the office on September 3 and that he worked from home on September 4 and 5. McGladrey did not have any time sheets documenting Ten Pas' hours. Lincoln also spoke to Dr. Roth, Dr. Keeshin, and to Ten Pas' spouse. Ten Pas' spouse related that Ten Pas worked at the office the morning of September 3 and that he worked remotely from the hospital on September 4 and 5.

Lincoln requested information regarding Ten Pas' duties as a lead tax partner from McGladrey. McGladrey responded by submitting a "New Partner Sketch." *Id.* ¶ 42. It listed some of his job requirements as: energetic leadership, high-quality technical expertise, management of net services of at least $1 million, billable hours, and significant involvement in sales to new clients. In a Disability Claim Job Analysis, McGladrey described Ten Pas' job duties as: "Tax partner responsible for reviewing and approving tax returns, tax planning memos and tax research memos." *Id.* ¶ 43. McGladrey also noted that Ten Pas supervised ten to fifteen people and that he was required to travel for work 10-15% of the time. *Id.*

On March 4, 2015, Lincoln informed Ten Pas that it had approved his long-term Disability claim and that it was "continuing to investigate his 'date of disability and salary as of the date of disability.'" *Id.* ¶ 58. Lincoln explained that it was "[c]urrently . . . using a date of disability of 08/31/2014 and a salary of $25,000.00 per month," and that it would issue a formal determination after obtaining additional documentation from McGladrey and Ten Pas' physicians. *Id.*; Doc. 48-4 at 220. Shortly thereafter, Ten Pas submitted an amended Physician Statement from Dr. Roth. Dr. Roth crossed out his previous response that Ten Pas' symptoms first appeared on August 31 and instead wrote September 6. Dr. Roth also amended the "date you recommend(ed) the patient stop work" from August 31 to September 6. Doc. 48 ¶ 60.

Lastly, Lincoln reviewed Ten Pas' medical records. Besides describing Ten Pas' multiple hospitalizations, the records indicated that he "had no significant medical problems prior to acute [myocardial infarction] on 8/31," and that he "had recent drug eluting stent placement on 9/1/2014 which was complicated by suspected periprocedural embolic stroke with subsequent hemorrhagic conversion." *Id.* ¶ 70.

On May 27, 2015, Lincoln sent Ten Pas a letter informing him that it had approved his Disability claim. The letter recounted the conflicting information surrounding his last day of work and Lincoln's subsequent investigation. Lincoln concluded that Ten Pas' Disability date, "the first day of Disability" under the Policy, *id.* ¶ 11, was August 31, 2014. Lincoln further stated that Ten Pas had paid disability premiums for the pay period ending August 31, 2014, based on a semi-monthly salary of $12,500. Thus, Lincoln calculated Ten Pas' benefits according to his monthly salary on August 31: $25,000. His benefits, calculated at 60% of his monthly salary, came out to $15,000 a month.[1] Had Lincoln calculated Ten Pas' benefits according to his monthly salary after September 1, which was $30,000 a month, his monthly Disability benefits would have been $18,000 a month.

## IV. First Appeal

On November 20, 2015, Ten Pas appealed Lincoln's determination. Ten Pas argued that he was able to continue working and performing the Main Duties of his job consistently during the first week of September, and therefore he was not disabled before the stroke on September 6. Ten Pas also argued that even if he was unable to perform his duties after August 31, he was not "capab[le] of becoming 'disabled' until he was no longer 'Actively at Work,' which would occur on the next business or work day following the [Labor Day] holiday weekend, Tuesday, September 2, 2014." *Id*. ¶ 72.

As part of the appeal, Ten Pas submitted additional documentation, including a personal affidavit detailing the work that he performed during the week of September 1 through September 5. Ten Pas noted that on the evening of September 1 he worked remotely from the hospital, and that he had e-mailed some of his co-workers, "informing them of the heart attack and angioplasty" and encouraging them to "[k]eep the ship upright for a day or two." *Id*. ¶ 80.

---

[1] Social Security disability income further reduced Ten Pas' benefits.

7

On September 2, Ten Pas continued to work remotely, "which included reviewing received e-mails and sending e-mails, with clients and co-workers." *Id*. ¶ 82. On Wednesday, September 3, Ten Pas, "having been advised by [his] doctors that [he] was able to resume normal activities," returned to the office. *Id*. ¶ 84. He sent and received e-mails at the office before he began experiencing numbness in the afternoon when he was admitted to Highland Park Hospital. Ten Pas continued to receive and send e-mails from the hospital over the next two days.

Ten Pas also submitted affidavits of three co-workers, each stating that Ten Pas worked remotely "at various times on September 1 through September 5." *Id*. ¶ 85. The affidavits stated that: "The realities of our profession are such that we are sometimes required to perform work remotely from space out of the office, including the preparation and transmittal of electronic correspondence and responding to electronic correspondence." *Id.*

Finally, Ten Pas submitted an affidavit from Dr. Roth, which stated:

> In completing the Original [Attending Physician Statement], I mistakenly indicated August 31, 2014 as the date that Harlan "stop work." The entry was mistaken for two reasons. First, I had and have no personal knowledge of Harlan's condition prior to September 16, 2014, the date that I first saw him. Second, nothing in Harlan's medical records suggest that prior to Harlan's stroke on September 6, 2014, Harlan was unable to work.

*Id*. ¶ 86. Dr. Roth opined that Ten Pas should have stopped working on September 6 rather than August 31 as he had initially indicated.

On February 19, 2016, Lincoln informed Ten Pas that it would uphold its initial decision. The determination letter recounted Ten Pas' hospitalizations and concluded that "[a]lthough it was reported that [Ten Pas] did answer/send emails from his laptop while in the hospital at times and/or was working from home, we find that he did not at any point return to full-time performance of all main duties of his own occupation, for the regularly scheduled number of

8

hours." *Id*. ¶ 89. The letter continued: "Therefore, [Ten Pas] was not Actively at Work and he was disabled as of 08/31/2014." *Id*.

V.  **Second Appeal**

On May 27, 2016, Ten Pas sought a final administrative appeal on the same grounds as his previous appeal. He argued that the Policy "expressly provides that an individual who is actively at work on the last day of the work week remains, for the purposes of the Policy, actively at work until, at the earliest, the next business day." *Id*. ¶ 92. On July 8, 2016, Lincoln informed Ten Pas that it would again uphold its initial decision. The final determination letter stated that Ten Pas was "'Actively at Work' up until [his] medical condition as of 08/31/2014 and the events following. [Ten Pas] never resumed all full-time performance of all main duties after 08/31/2014. . . . Therefore, [Ten Pas] was not 'Actively at Work' after 08/31/2014." *Id*. ¶ 96.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

9

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002).

The summary judgment standard operates differently when the Court reviews the determination of an ERISA plan administrator. Where a benefits plan governed by ERISA grants the administrator discretion to determine eligibility and construe the plan terms, courts employ an arbitrary-and-capricious standard of review. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010); *see also Fischer v. Liberty Life Assur. Co. of Bos.*, No. 05 C 3256, 2008 WL 4874302, at *4 (N.D. Ill. June 16, 2008) ("[T]he umbra of the arbitrary-and-capricious standard of review has the effect of nearly eclipsing the requirement to construe all inferences in favor of the non-movant."), *aff'd*, 576 F.3d 369 (7th Cir. 2009). This has been described as the "least demanding form of judicial review." *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) (citation omitted). The administrator's decision "may not be deemed arbitrary so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision." *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017) (citation omitted). The Court need only ask "whether the administrator's decision was completely unreasonable." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005).

## ANALYSIS

The parties agree that Lincoln was vested with authority to interpret the provisions of the Policy, and therefore the Court must employ the deferential standard of review. The parties

dispute when Ten Pas' Disability began and hence whether his benefits should reflect his salary increase on September 1, 2014. Ten Pas argues he is entitled to summary judgment because it was arbitrary of Lincoln to determine that Ten Pas became Disabled on August 31 when he was Actively at Work the entire holiday weekend. Lincoln responds that Ten Pas misconstrues the Active Work provision because it is unrelated to the date of Disability. Lincoln further argues that it is entitled to summary judgment because its determination regarding the date of Disability was reasonable in light of the evidence. To this, Ten Pas responds that even if he was not Actively at Work, the medical evidence creates a factual dispute regarding his date of Disability, and therefore the case must go before a jury. The Court first considers Lincoln's interpretation of the Active Work provision.

I. **Active Work Provision**

Ten Pas argues that he is entitled to summary judgment because he was not capable of becoming Disabled until September 2 when he was no longer Actively at Work. Ten Pas points out that an employee is "Actively at Work on . . . a Saturday, Sunday or holiday that is not a scheduled workday." *Id.* ¶ 21. Therefore, Ten Pas argues that he was Actively at Work on Sunday, August 31, and Monday, September 1. Thus, the Determination Date—"the last day worked just prior to the date the Disability begins," *id.* ¶ 19—was, at the earliest, Monday, September 1.

In response, Lincoln first contends that Ten Pas ignores the language immediately preceding the Active Work definition that states: "*Unless* disabled on the prior workday or on the day of absence, an Employee will be considered Actively at Work[.]" *Id.* ¶ 21 (emphasis added). According to Lincoln, "Active Work ends when disability begins." Doc. 53 at 7. Since Ten Pas

became disabled on Sunday, August 31, Lincoln argues that Ten Pas became "disabled . . . on the day of absence," and was no longer Actively at Work the following Monday. *Id.*

The Court agrees that an employee cannot be both Actively at Work and Disabled at the same time. But the Policy does not define "day of absence," nor does the context suggest that Sundays qualify as one. McGladrey's regular workweek ran Monday through Friday, and the word "absence" suggests an employee's "failure to be present at a usual or expected place." *See Absence*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/absence (last accessed November 26, 2019). In other words, missing work on a regularly scheduled workday would be a "day of absence." But Ten Pas was not required to work on the weekend so failing to work on a Sunday would not count as a "day of absence" that would remove him from Active Work status.

Lincoln's nonetheless argues that Active Work has nothing to do with the date of Disability or the Determination Date because Active Work and Actively at Work are specifically defined terms whose meaning only applies to the provisions that incorporate them. *See Schultz*, 670 F.3d at 838 ("Plan language is given its plain and ordinary meaning, and the plan must be read as a whole, considering separate provisions in light of one another and in the context of the entire agreement."); *Lafayette Life Ins. Co. v. Arch Ins. Co.*, 784 F. Supp. 2d 1034, 1042–43 (N.D. Ind. 2011) ("A contract's definitions apply only when the defined term is actually used; when undefined terms are used they are given their plain and ordinary meaning."). The Determination Date does not refer to Active Work. The Policy provisions that do refer to it are the "Effective Dates" and "Individual Termination" sections, which provide that an employee's coverage becomes effective when they begin Active Work and terminates when they end Active Work. Doc. 48-1 at 113–16. Lincoln argues that the Active Work terminology simply ensures

that an employee remains covered on weekends, holidays, and other non-medical leaves of absence even though they are not at the office on those specific days.

Contrary to what Lincoln argues, the Active Work provision is relevant to ascertaining the Determination Date. In the definition of the Determination Date— "the last day worked just prior to the date the Disability begins," Doc. 48 ¶ 19— the Policy does not define "the last day worked" or "the date the Disability begins." But, as already discussed, Active Work and Disability do not overlap. Lincoln made this point in the appeal determination letters where it described Active Work and Disability as different sides of the same coin. *Id.* ¶ 89, 96 ("Your client was 'Actively at Work' up until your client's medical condition as of 08/31/2014[.]"). Consider also that the Individual Termination section allows an employee to remain covered while on Disability if the employer continues to pay the required premiums. This is only necessary if an employee cannot remain Actively at Work while on Disability.

In this case, each term can also be understood as the antithesis to the other because the only justification for removing Ten Pas from Active Work was his Disability. Because Sunday and Monday are not "days of absence" on which he could become Disabled under the Active Work provision, he must have remained Actively at Work through the holiday weekend, and Ten Pas could not have become Disabled until the following Tuesday. This accords with the definition of Disability because it was the first regularly scheduled workday that he could not perform the regular duties of his occupation.

Having determined that it was unreasonable to set the date of Disability any earlier than Tuesday, September 2, the only remaining question is how to interpret "the last day worked." It cannot mean the last regularly scheduled workday because such a reading would render the term "workday" superfluous and arbitrarily narrow the plain meaning of "last day worked." Ten Pas,

for example, worked on Saturday, August 30, and Sunday, August 31, even though these were not regularly scheduled workdays. Nor can the term mean the last day the employee actually worked because this would be incongruous with other portions of the Policy. For instance, McGladrey pays premiums for disability benefits on a monthly basis as a percentage of its payroll, and Lincoln does not pay benefits that exceed "the amount for which premium has been paid." *Id.* ¶ 19. So, if an employee receives a raise while on a four-week paid vacation, McGladrey would begin to pay a higher premium while that employee was out of the office. If the "last day worked" reaches back to before the employee began his vacation, and then the employee falls ill shortly before returning to work, Lincoln would pay benefits according to the pre-vacation salary, and McGladrey would have paid the higher premiums for naught. The only reasonable interpretation of the Policy is to read the "last day worked" in conjunction with the Active Work provision. Under this scenario, the employee on paid vacation would still be Actively at Work and receive benefits tied to his salary increase while on vacation. Similarly, Ten Pas' "last day worked" could not have fallen any earlier than Monday, September 1, and Lincoln should have calculated his monthly benefits according to his September 1 salary. Consequently, Ten Pas is entitled to summary judgment, and the Court need not consider any further argument.

## CONCLUSION

For the foregoing reasons, the Court denies Lincoln's motion for summary judgment [47] and grants Ten Pas' motion for summary judgment [44]. The Court enters judgment for Ten Pas and terminates this case.

Dated: December 10, 2019

_____
SARA L. ELLIS
United States District Judge